UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

DANIEL SAWKA,
　　　　　Plaintiff,

　　v.　　　　　　　　　　　　　　　　CASE NO. 3:13-cv-754 (VAB)

ADP, INC.,
　　　　　Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

　　　　Plaintiff, Daniel Sawka, sued his former employer, ADP, Inc. ("ADP"), claiming

that its managers and employees inappropriately sexually harassed him, because he

posed nude for Playgirl Magazine in 1991.  *See* Compl., ECF No. 1.  He claims that this

harassment constituted discrimination against him on the basis of his sex in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*, and the

Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-51 *et seq.*

Compl. at First, Second, Third, and Fifth Counts, ECF No. 1.  Mr. Sawka also alleges

that, as a result of the harassment, his job performance declined and he suffered

depression, humiliation, and embarrassment.  Compl. ¶¶56-60, 62-65, 68-71, 79-82,

ECF No. 1.  He also claims that ADP retaliated against him when he complained about

the harassment in violation of the same statutes.  *Id.* at Fourth and Sixth Counts.

Finally, he asserted, in his Complaint, claims for negligent and intentional infliction of

emotional distress.  *Id.* at Seventh and Eighth Counts.

　　　　On ADP's Rule 12(b)(6) motion, the Court dismissed his claim for negligent

infliction of emotional distress.  Mot. to Dismiss Ruling 12-14, ECF No. 31; Fed. R. Civ.

P. 12(b)(6).  It permitted the remaining seven claims to proceed to discovery.  *Id.*  ADP

has now moved for summary judgment on all of the seven remaining claims.  Mot. for Summ. J., ECF No. 42.  For the following reasons, ADP's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    STATEMENT OF FACTS[1]

Mr. Sawka posed nude for Playgirl Magazine in 1991.  Def.'s Local Rule 56(a)1 Stmt. ¶31, ECF No. 43.  At least one of these photographs had a lumberjack theme, showing Mr. Sawka in the woods holding an ax.  *Id.* ¶33.  These photographs were originally published only in paper form in May 1992 but eventually, and at some time prior to Mr. Sawka's employment at ADP, became available on the Internet and could be located by a Google search.  *Id.* ¶32; Def.'s Ex A., Sawka Dep. 83:13-14.

Mr. Sawka's core allegation in this lawsuit is that his colleagues and managers at ADP discovered these photographs online, looked at them frequently in the workplace, and verbally harassed him regarding their content and existence.  Pl.'s Counterstmt. ¶¶ 1-38, ECF No. 54-2.  He claims that this alleged harassment negatively impacted his work performance, caused anxiety, panic attacks, and depression, embarrassed and humiliated him, and ultimately caused him to resign from ADP.  *Id.* ¶¶27, 50, 52-54; Def.'s Ex. A, Sawka Dep. 64:5-12.

Mr. Sawka was hired by ADP as a "District Manager," or salesperson, in November 2009 for its "Small Business Services Division."  Def.'s Local Rule 56(a)1 Stmt., ¶¶ 6-7, ECF No. 43.  He was initially based in ADP's office located in Windsor, Connecticut but moved to the office in Milford, Connecticut in April 2010.  *Id.* ¶8; Def.'s Ex. A, Sawka Dep. 39:2-14.  Some components of Mr. Sawka's job required him to be

---

[1] These facts are based on a review of the pleadings, Local Rule 56(a) Statements, and any responses, as well as exhibits filed by both parties accompanying the Motion for Summary Judgment and related briefing.  Unless noted otherwise, facts described in this section are undisputed or the opposing party has not pointed to any contradictory evidence in the record.

physically present in the office, others required him to be out in the field making sales. Def.'s Local Rule 56(a)1 Stmt. ¶¶11-14, ECF No. 43; Pl.'s Local Rule 56(a)2 Stmt. ¶11-13, ECF No. 54-2.[2]

Mr. Sawka's performance at ADP was "measured on a number of different bases, including the number of 'starts,' when a client paid for and began to receive ADP's services [for the first time], and the number of 'sales,' when a client signed a sales order agreeing to ADP's pricing, a power of attorney for tax money movement, and a client account agreement."  Def.'s Local Rule 56(a)1 Stmt.  ¶16, ECF No. 43.  He also became subject to a quota two or three months after he began working for ADP, meaning that ADP expected him to make a certain dollar amount in sales per month.  *Id.* ¶15; Def.'s Ex. A, Sawka Dep. 96:10-16.

Initially, Mr. Sawka met ADP's sales goals.  Def.'s Local Rule 56(a)1 Stmt. ¶¶17-20, ECF No. 43.  Beginning in the last quarter of 2010 (October through December), Mr. Sawka failed to meet his "starts" quota.  *Id.* ¶21.  He had a series of e-mail discussions and in-person meetings with management from December 2010 to January 2011 to discuss these low sales results.  *See id.* ¶¶ 22-27, 29-30, 34.  At one of these meetings, Mr. Sawka was asked to sign a "Performance Improvement Plan – Warning" but refused to do so.  *Id.* ¶¶ 27-28.[3]  This warning was a statement that Mr. Sawka would be "expected to demonstrate significant improvement" and if he failed to do so, "further

---

[2] The parties dispute how much time Mr. Sawka actually spent in the office at ADP.  *Id.*  Mr. Sawka asserts that he was required to report to the office every day at times and that he would spend "whole days" in the office on occasion.  Pl.'s Local Rule 56(a)2 Stmt. ¶¶11-12, ECF No. 54-2.  ADP contends that Mr. Sawka spent only about half of his working time in the office, citing Mr. Sawka's own testimony.  Def.'s Local Rule 56(a)1 Stmt. ¶11, ECF No. 43 (citing Def.'s Ex. A, Sawka Dep. 33, 219).

[3] Mr. Sawka does not directly controvert paragraph 28, but rather provides more of an explanation for why he refused to sign the Performance Improvement Plan Warning.  Pl.'s Local Rule 56(a)2 Stmt. ¶28, ECF No. 54-2.  He claims he had not been placed on "initial warning" as of the date of the Plan Warning, which was backdated.  *Id.*

corrective action, up to and including termination, may occur." *See* Def.'s Exs. F, I, Performance Improved Plan - Warnings.

During one of these meetings, on January 17, 2011, Mr. Sawka mentioned to Theresa Madden that his colleagues were searching the Internet for his nude photographs from Playgirl Magazine, viewing them at the office, and harassing him about them while at work. Def.'s Local Rule 56(a)1 Stmt. ¶¶35-36, ECF No. 43. He told Ms. Madden that this conduct had occurred the entire time he was employed at ADP. *Id.* ¶36. Ms. Madden was "Director, HR Business Partner," and Mr. Sawka's dedicated human resources contact, whose job duties included investigating sexual harassment complaints. *Id.* ¶¶2, 4.[4] Both sides agree that this January 17, 2011 meeting was the first and only time Mr. Sawka complained to Human Resources that he was feeling harassed and discriminated against by his colleagues because of the Playgirl Magazine photographs. *Id.* ¶¶37-38.[5] However, as will be described in further detail below, Mr. Sawka contends that ADP managers had been aware of the harassment for some time prior to his formal complaint. *See* Pl.'s Local Rule 56(a)2 Stmt. ¶¶37-38, ECF No. 54-2.

Ms. Madden and one of ADP's attorneys, Ms. Joan Ibsen, investigated Mr. Sawka's harassment complaint by interviewing a list of witnesses he provided them, as well as some other employees. Def.'s Local Rule 56(a)1 Stmt. ¶¶39-43, ECF No. 43; Def.'s Ex. J, E-mail dated 1/17/2011 (from Mr. Sawka providing a list of names); Def.'s Ex. L, Madden Dep. 15:7-22 (noting that the "plan" for the investigation was to speak to

---

[4] Because she was based in New Jersey at the time, her discussions with Mr. Sawka occurred by phone. Pl.'s Ex. A, Sawka Dep. 145:2-12.
[5] ADP believes that this evidence undercuts the credibility of Mr. Sawka's testimony that he felt harassed. It reasons that if he were truly upset by the conduct of his colleagues, he would have mentioned it earlier and more often. *See e.g.,* Mot. for Summ. J. 7, ECF No. 42-1. At this stage, however, the Court must credit Mr. Sawka's version of events. *See Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 546 (2d Cir. 2010) (citations omitted).

witnesses).[6]  Ms. Madden testified that virtually all employees that were interviewed

during the investigation had at least a general awareness that Mr. Sawka posed nude for

Playgirl Magazine.  Pl.'s Ex. B, Madden Dep. 76:24-77:6.  ADP's internal report, which

memorialized the investigation and was signed by Ms. Madden, concluded that "[f]ellow

associates were googling past pictures and comments were made at roll call meetings

and an associate [, Dan Esposito,] had an inappropriate discussion about the topic at a

Quota Busters dinner with the complainant."  Def.'s Ex. K, Ibsen Aff., Ex. 1,  Ethics

Hotline Confidential Memorandum dated 1/17/2011; Pl.'s Ex. B, Madden Dep. 54:6-21

(identifying Mr. Esposito as the associate who made the comments at the "Quota

Busters" dinner and indicating the comments involved the Playgirl Magazine

photographs).  The investigation also uncovered that managers Ryan Errico and Bruce

Bishop were aware that employees were searching the Internet for Mr. Sawka's

photographs.  Pl.'s Ex. B, Madden Dep. 35:3-15, 57:13-58:12; Def.'s Local Rule 56(a)1

Stmt. ¶¶9-10 (identifying Mr. Errico as a manager to whom Mr. Sawka reported).  In

addition, witnesses recalled the terms "lumberjack" and "timber" being used at roll call

meetings but could not identify specifically who made the comments.  Def.'s Local Rule

56(a)1 Stmt. ¶46, ECF No. 43.  Roll call meetings were held weekly and provided

---

[6] ADP claims that it spoke to all of the current employees Mr. Sawka identified as witnesses.  Mot. for Summ. J. 9, ECF No. 42-1.  The Court finds record evidence that all but Mike Zacarro, Kelly Waddock, and Joe Pivarnick were interviewed or spoken to by ADP in some capacity about Mr. Sawka's complaint.  *See* Def.'s Ex. L, Madden Dep. 15:16-17, 38:11-14, 40:15-16, 47:6-9; Def.'s Ex. K, Ibsen Aff., Ex. 1, Ethics Hotline Confidential Memorandum dated 1/17/2011.  Ms. Madden recalled that Mr. Sawka identified Ms. Waddock as a witness but does not specifically testify about speaking with her during the investigation. Def.'s Ex. L, Madden Dep.  11:7-10.  There is no evidence in the record that ADP  interviewed Ms. Alvord who was not identified by Mr. Sawka in his e-mail.  Def.'s Ex. J, E-mail dated 1/17/2011; *see also* Mot. for Summ. J. 14, ECF No. 42-1.  The Court has not record evidence that ADP interviewed Grant Cook or Jonathan Kaplan, who it contends no longer worked for ADP at the time Mr. Sawka made his complaint. The Court also has no record evidence that ADP interviewed the following individuals who Mr. Sawka now claims were involved in the harassment: James Leduc, Dani Briggs, Stephen Lanzit, John Walsh, Travis Drew, Alexa Buchwald, or Mike Gregor.

everyone in the Small Business Services Division an opportunity to meet and discuss sales for the prior week or month.  Def.'s Ex. A, Sawka Dep. 35:2-11, 35:20-36:1.

However, ADP concluded that its investigation did not reveal that any employees were searching for or viewing the pictures in the workplace.  Pl.'s Ex. B, Madden Dep. 43:3-5.  Only one of Mr. Sawka's colleagues admitted viewing the photographs during the investigation and said that she did so on her personal computer at home.  Def.'s Local 56(a)1 Stmt. ¶¶44-45, ECF No. 43[1]; Def.'s Ex. L, Madden Dep. 21:18-23, 45:19-46:3; Pl.'s Ex. B, Madden Dep. 77:7-10.  The other employees ADP interviewed denied viewing the photographs, but a few indicated that they had tried to search for them in the workplace.  Def.'s Ex. L, Madden Dep. 45:19-46:3.

Mr. Sawka criticizes the manner in which ADP conducted its investigation.  He argues that the investigation was inadequate because ADP never inspected the company's computers to determine whether the employees had actually been viewing the nude photographs or searching Mr. Sawka's name on the Internet at work.  Opp. Br. 19-20, ECF No. 54-1; Pl.'s Counterstmt. ¶46, ECF No. 54-2.[7]  The parties dispute whether the appropriate witnesses were interviewed during the investigation—Mr. Sawka argues that a number of witnesses he identified were not interviewed, but ADP asserts that these individuals were former employees.  In addition, Ms. Madden did not share the full results of the investigation when Mr. Sawka requested them in February 2011.  Def.'s Ex. A, Sawka Dep. 184:12-185:8.  Mr. Sawka testified that Ms. Madden had an "adversarial attitude" toward him, was "disrespectful" and "demeaning" to him, and yelled at him when he requested the results.  *Id.* 185:21-186:1, 191:10-16, 200:13-14.

---

[7] Both sides agree that the investigation did not involve a search of computers to verify employees' Internet activity.  Pl.'s Ex. B, Madden Dep. 30:8-11; Def.'s Ex. L, Madden Dep. 46:13-25.

Mr. Sawka also argues that ADP's investigation results, as the company articulates them, do not provide a complete picture of the harassment he experienced. Mr. Sawka contends that "constant" harassment occurred "throughout" his employment at ADP.  Pl.'s Counterstmt. ¶¶1-2, 28, 33, ECF No. 54-2; *see e.g.,* Def.'s Ex. A, Sawka Dep. 165:18-19; *see also e.g.,* Pl.'s Ex. A, Sawka Dep. 177:3-6.[8]  According to Mr. Sawka, as corroborated by three of his colleagues, his nude pictures were viewed by a number of his colleagues in the workplace, and numerous comments were made to him about them.  *See* Pl.'s Counterstmt. ¶¶1-38, ECF No. 54-2; Pl.'s Ex. E, Razette Aff. at 1; Pl.'s Ex. F, Zaccaro Aff. at 1; Pl.'s Ex. G, Waddock Aff. at 1; *see also e.g.,* Pl.'s Ex. D, Razette Dep. 16:20-17:15, 18:4-12; Def.'s Ex. A, Sawka Dep. 167:15-20.  Testimony in the record also supports the notion that some of these comments involved the "details of both his physique and genitals."  *See* Pl.'s Ex. E, Razette Aff. at 1 ("There were [ ] numerous conversations while I was present regarding the content of the photos and details of both his physique and his genitals.")[9]; *see also e.g.,* Pl.'s Ex. A. Sawka Dep. 195:2-18.  He also testified that the harassment "got worse" when he moved to the Milford office, beginning in April 2010, because it happened "more frequently" and in more public settings.  Pl.'s Ex. A, Sawka Dep. 232:6-233:24.

---

[8] ADP objects to much of Mr. Sawka's testimony that supports these generalized allegations as hearsay; indeed Mr. Sawka admits that he heard many of the facts that enable him to make these generalized allegations from others.  *See e.g.* Def.'s Ex. A, Sawka Dep. 154:1-18, 168:2-6, 172:12-22.  Comments indicating that everyone around the office knew about the photographs are not hearsay.  However, many portions of Mr. Sawka's deposition do constitute hearsay in their current form.  The Court will still consider them at this stage because they could be presented in admissible form at trial by calling as witnesses directly the individuals who told Mr. Sawka what they observed. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Fraser v. Goodale,* 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents"), *cert. denied,* 541 U.S. 937 (2004).
[9] When asked at his deposition, Mr. Razette could not recall any specific examples of these kinds of comments.  Pl.'s Ex. D, Razette Dep. 24:14-23.

Many of ADP's employees made comments that generally referenced the existence of the photographs and/or their lumberjack theme in the workplace. *See* Pl.'s Local Rule 56(a)2 Stmt. ¶¶8, 12-13, 18, 22, 29-30, 32, ECF No. 54-2; Pl.'s Ex. D, Razette Dep. 14:12-24. Mr. Sawka indicates that throughout his time at ADP, he was referred to as "timber, lumberjack, [and] Ranger Dan" by various individuals, including John Walsh and Travis Drew as well as Mike Gregor, who made "periodic comments" of that nature. Pl.'s Ex. A Sawka Dep. 165:12-17, 169:21-25, 175:1-176:5,. Consistent with the results of ADP's investigation, Mr. Sawka also shows that similar comments were also made at several roll call meetings when his picture was put up in a presentation.[10] *Id.* 173:25-174:8; Pl.'s Ex. E, Razette Aff. at 1; Pl.'s Ex. F, Zaccaro Aff. at 1; Pl.'s Ex. G, Waddock Aff. at 1.[11]

During his deposition, Mr. Sawka observed that these kinds of comments occurred "so frequently" that he could not remember the details of every encounter. *See* Pl.'s Ex. A, Sawka Dep. 149:20-22, 150:3-7, 167:6-13, 169:14-20. However, he did recall the specifics of a few incidents. For example, in November of 2009, James Leduc, an ADP employee, said that other employees were searching the Internet for the Playgirl pictures and showing them to others in the office and that "everybody in the office knew about it." Pl.'s Counterstmt. ¶¶10-11, ECF No. 54-2; Def.'s Ex. A, Sawka Dep. 161:7-20. In April or May 2010, "[t]wo complete strangers" asked him at training whether he was "the one," which in his view referred to the photographs. Def.'s Ex. A, Sawka Dep.

---

[10] Mr. Sawka explained that the picture of each employee who made sales during the prior week was projected onto a screen during the roll call meetings with that individual's sales numbers for the week. *Id.* 36:2-15.

[11] The parties dispute when these comments were made. Mr. Sawka testified that they occurred when he was in the Milford office, April 2010 and later. Pl.'s Ex. A, Sawka Dep. 174:6-25 (noting that these comments were made in the Milford office, at which Mr. Sawka worked beginning in April 2010). Ms. Madden testified that these comments had not happened recently, when she was conducting her investigation in early 2011. Pl.'s Ex. B, Madden Dep. 43:17-25.

173:4-15.  He also testified that Ms. Waddock told him at an unspecified date and time that she looked at the pictures at home at night.  Pl.'s Counterstmt ¶ 13, ECF No. 54-2; Def.'s Ex. A, Sawka Dep. 163:17-21.  Mr. Sawka also testified that on an unknown date a manager, Christina Theokary¸ "might have said something about, you know, the woods or were you in the woods this weekend? Did you chop a tree down?."  Pl.'s Local Rule 56(a)2 Stmt. ¶53, ECF No. 54-2.  He also claims that Bruce Bishop made comments about the photographs but could not recall specifically what they were.  Def.'s Ex. A, Sawka Dep. 265:15-18.

Aside from these more generalized allegations, Mr. Sawka has identified the following specific instances of what he believes to be harassing conduct, listed in chronological order to the extent possible.  ADP does not directly dispute that these incidents occurred, but the vast majority of them, based on the record, did not surface during its investigation.

- Before April 2010:  When Mr. Sawka was working in the Windsor office, an ADP colleague named Grant Cook asked him if he "'realize[d] how many gay men are probably looking at [the] pictures and masturbating.'"  Pl.'s Counterstmt. ¶9, ECF No. 54-2 (quoting Ex. A, Sawka Dep. 160:15-18).[12]  Mr. Sawka testified that no one else was present at the time Mr. Cook made the comment.  Def.'s Ex. A, Sawka Dep. 160:25-161:6.

---

[12] ADP contends that this comment was made in April 2010 in its brief, but the deposition testimony cited to support that statement does not contain a date but rather Mr. Sawka's testimony that he did not recall when the statement was made.  Mot. for Summ. J. 16, ECF No. 42-1 (citing Def.'s Ex. A, Sawka Dep. 160).  Instead, Mr. Sawka testified that the comment was made while he was in the Windsor office, where he was located from November 2009 through March 2010.  *See* Def.'s Ex. A, Sawka Dep. 160:19-24 (noting that Mr. Cook made the comment while Mr. Sawka was working in the Windsor office, which he left in April 2010), 39:2-14 (providing the timeframe during which Mr. Sawka was resident in the Windsor and Milford offices).

- April 2010: Katy Alvord, another ADP employee, told him "everybody had seen the pictures," and that, "you have a beautiful cock, let me fuck the shit out of you."  Pl.'s Counterstmt. ¶5, ECF No. 54-2 (quoting Pl.'s Ex. A, Sawka Dep. 151-52, 169-170).

- April 2010: At a quota busters award dinner, ADP employee Dan Esposito loudly said, "I wanted to hate you because you have a big cock or your cock is bigger than mine and you own a bar [ ] but you are a good guy so I can't really hate you." Def.'s Local Rule 56(a)1 Stmt. ¶17; Def.'s Ex. A, Sawka Dep. 164:15-19.  Steve Duke, ADP's manager of the Poughkeepsie region, heard this comment and laughed and said "the entire region knows about your pictures. But don't worry about it.  It's nothing to be ashamed of."  Def.'s Ex. A, Sawka Dep. 164:10-23.  Scott Martin, a manager, was also sitting at the table.  *Id.* 164:24-165:1, 288:17-25; Def.'s Ex. D, Martin Aff. ¶2.  When Mr. Sawka asked Mr. Esposito to stop talking about the photographs, he laughed and said Mr. Sawka did not need to worry about it and everyone had "already seen it." Def.'s Ex. A, Sawka Dep. 165:2-7.

- July 2010/Summer 2010: After overhearing men and women make comments about the photographs, Mr. Sawka stood up from his desk in his cubicle and asked everyone "to stop Googling him and leave him be."  Pl.'s Local Rule 56(a)2 Stmt. ¶37; Def.'s Ex. A, Sawka Dep. 157:16-158:18; Pl.'s Ex. D, Razette Dep. 26:19-24.  He described the ADP offices as an "open room" with cubicles, where, presumably, any comments made in the room could be readily heard by both him and other employees.  Def.'s Ex. A, Sawka Dep. 220:3-12.  Mr. Sawka contends that Ryan Errico, his direct supervisor, saw this event

10

happen, but has not provided any evidence that Mr. Errico recalls the incident.  *Id.* 117:6-9, 159:2-10.

- August 2010: On a trip to Yankee stadium organized by ADP, Jonathan Kaplan loudly mentioned the Playgirl Magazine photographs and asked general questions about what the experience was like and what Mr. Sawka had done while posing for the photographs.  Def.'s Local Rule 56(a)1 Stmt. ¶18; Pl.'s Counterstmt. ¶¶7, 15; Def.'s Ex. A, Sawka Dep. 155:3-156:17.  He asked questions such as "Did they want you to have an erection, or what were you doing? Was anybody around? Were there girls on set? [ ] Who else was there?"  Def.'s Ex. A, Sawka Dep. 195:11-21.  Mr. Sawka testified that other employees, including Alexa Buckwald and Nick Razette, overhead the comments, and that they were made near David Cone[13], which made the experience embarrassing.  *Id.* 155:12-17, 156:2-15.

- April-October 2010:  Sometime between April and October 2010, Kelly Waddock told him while she was in the office that she was bored and that she was going to Google what happened in May of 1992, referring to the month and year that the relevant issue of Playgirl Magazine was released.  Pl.'s Counterstmt. ¶12, ECF No. 54-2; Def.'s Ex. A, Sawka Dep. 162:16-25.  When Mr. Sawka told her to stop, she laughed.  Def.'s Ex. A, Sawka Dep. 163:1-5.  Mr. Sawka does not know whether anyone overhead the comment.  *Id.* 163:9-16.

---

[13] David Cone is a former Major League Baseball pitcher who played for the Yankees and was located near Mr. Sawka when the comments were made because he was signing autographs.  Def.'s Ex. A, Sawka Dep. 155:3-7, 156:3-5.

- April-December 2010: "[B]etween April 2010 and December 2010," another ADP employee, Nicole Vitti, mentioned in the presence of Bruce Bishop and Mr. Sawka that she had searched for him on Google and seen "everything." Pl.'s Counterstmt. ¶8; Def.'s Ex. A, Sawka Dep. 156:21-157:13.  Mr. Sawka asked Mr. Bishop, who was a member of the management team, whether "that" was a serious "HR concern," and Mr. Bishop laughed in response.  *Id.*

Mr. Sawka claims that he did not report these incidents to Human Resources sooner, because ADP's managers were complicit in the events (because they had viewed and participated in the harassment), and it was embarrassing for him to discuss.  Pl.'s Counterstmt. ¶¶27, 34, ECF No. 54-2.  Two of his colleagues, Nick Razette and Kelly Waddock, also confirmed that they believed the managers were aware that employees were searching for the photographs and making jokes and comments about them. Pl.'s Ex. D, Razette Dep. 15:24-16:11, 27:18-22; Pl.'s Ex. E, Razette Aff. at 1; Pl.'s Ex. G, Waddock Aff. at 1.  Mr. Errico confirmed in his testimony that he recalled employees referring to Mr. Sawka as a lumberjack and that he knew the term had some relation to his past and that he posed for photographs but not a precise understanding of that relationship until after Mr. Sawka left ADP's employment.  Def.'s Ex. C, Errico Dep. 37:20-22, 39:18-40:18.

Mr. Sawka also claims that ADP did not take sufficient measures to stop the harassment after the investigation was completed. [14]  He testified that he recalls fellow employees making comments to him about the photograph in March of 2011 and that

---

[14] While Mr. Razette's Affidavit indicates that nothing was done after the investigation, he left ADP in February 2011 and, thus, cannot indicate whether corrective action was taken after he left.  Pl.'s Ex. E, Razette Aff. at 2. Ms. Waddock also attests that ADP did nothing after the investigation, but she left the company on March 8, 2011.  Pl.'s Ex. G, Waddock Aff. at 1.  Given the timing and nature of these witnesses' comments, neither individual's testimony is sufficient to show that ADP did absolutely nothing to remedy the situation after it concluded its investigation.

nothing changed after the investigation.  Pl.'s Ex. A, Sawka  Dep. 190:25-191:9, 192:1-8.
Both sides agree that Mr. Sawka did not complain to Human Resources about any
further harassment that occurred after the investigation.  Def.'s Local Rule 56(a)1 Stmt.
¶48; Pl.'s Local Rule 56(a)2 Stmt. ¶48.[15]

ADP's internal report noted "ADP will take appropriate action to remedy the
situation."  Def.'s Ex. K, Ibsen Aff., Ex. 1, Ethics Hotline Confidential Memorandum
dated 1/17/2011.  As a result of the investigation, ADP informally spoke to Dan Esposito
about the comments he made at the quota busters dinner but did not take any formal
disciplinary action against him.  Pl.'s Ex. B, Madden Dep. 54:6-21.  ADP also claims that
it instructed Scott Martin, Vice President at the time of the Small Business Department,
to report anything in the office about other employees searching the Internet for Mr.
Sawka or referring to him as a lumberjack or saying timber.  Def.'s Supp. Br., Ex. D,
Madden Dep. 55:18-56:5; Pl.'s Ex. A, Sawka Dep. 117:1-5.  Mr. Sawka does not point to
specific evidence contradicting these assertions, nor does he directly dispute them.

Mr. Sawka testified that the harassment he experienced caused him emotional
distress in that he suffered "[c]onstant humiliation, harassment, feelings of depression,
[and] anger."  Pl.'s Counterstmt. ¶¶51-52, ECF No. 54-2 (alterations in original).  He also
claims that he had anxiety, headaches, panic attacks, loss of sleep, and nausea, as
physical symptoms of his emotional distress.  *Id.* ¶¶53-54.  However, he did not seek
medical care in connection with any of these feelings or symptoms.  Def.'s Ex. A, Sawka
Dep. 64:15-22.  Several of Mr. Sawka's colleagues confirmed that the comments
appeared to make him uncomfortable or upset.  *See e.g.* Pl.'s Ex. E, Razette Aff. at 1-2;

---

[15] Mr. Sawka contends he did not report any additional harassment because Ms. Madden had yelled at
him and refused to give him information regarding her investigation and because no remedial action was
taken, despite the fact that the investigation showed his allegations were true.  Pl.'s Local Rule 56(a)2
Stmt. ¶48, ECF No. 54-2.

Pl.'s Ex. F, Zaccaro Aff. at 1.  Mr. Sawka contends that these feelings and symptoms impacted his performance at ADP in a "detrimental way," by causing him to "[m]iss out on opportunities potentially."  Def.'s Ex. A, Sawka Dep. 270:13-271:22.  He testified. in particular, that the fact that the manages were aware of the harassment and did nothing was "belittling and demeaning and disrespectful."  *Id.* 273:16-19.

Ultimately, Mr. Sawka resigned from his position at ADP on March 31, 2011.  Def.'s Local Rule 56(a)1 Stmt. ¶¶49-51, ECF No. 43.  He testified that he felt forced to do so because of the situation he faced in the workplace.  Pl.'s Local Rule 56(a)2 Stmt. ¶51, ECF No. 54-2.  In this case, he seeks compensatory and punitive damages for the events described above as well as attorneys' fees and costs, job reinstatement, and an injunction requiring ADP to remove all "adverse" information from his personnel file.  Compl. at Demand for Relief, ECF No. 1.

## II.   STANDARD

To grant a motion for summary judgment, the Court must determine that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A dispute regarding a material fact is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted).  In assessing a summary judgment motion, the Court must resolve all ambiguities, including credibility questions, and draw all inferences from the

record as a whole in favor of the non-moving party.  *See Kaytor v. Elec. Boat Corp.,* 609

F.3d 537, 546 (2d Cir. 2010) (citations omitted).

Under Title VII and CFEPA, claims of employment discrimination and retaliation

are governed by the burden shifting analysis the Supreme Court set out in *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Weinstock v. Columbia Univ.,*

224 F.3d 33, 42 (2d Cir. 2000) (citation omitted) (analyzing Title VII sex discrimination

claims); *Grey v. City of Norwalk Bd. Of Educ.,* 304 F. Supp.2d 314, 321, 328 (D. Conn.

2004) (evaluating constructive discharge and hostile work environment claims under

Title VII and CFEPA); *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.

1996) (in the context of a Title VII retaliation claim).  Under this framework, Mr. Sawka

bears the initial burden of establishing a prima facie case.  *Weinstock,* 224 F.3d at 42.

Once he has made a prima facie showing on all elements of each claim, "the burden then

shifts to the employer to 'articulate a legitimate, clear, specific and nondiscriminatory

reason' for its actions."  *Grey,* 304 F. Supp.2d at 322 (quoting *Quaratino v. Tiffany &*

*Co.,* 71 F.3d 58, 64 (2d Cir. 1995)); *see also Terry v. Ashcroft,* 336 F.3d 128, 138, 141 (2d

Cir. 2003) (citations omitted) (in the Title VII race and gender discrimination and

retaliation contexts).  If the employer makes this showing, for the case to continue past

summary judgment, the plaintiff then must "establish by a preponderance of the

evidence that the employer's stated reason was merely a pretext for discrimination."  *See*

*Grey,* 304 F.Supp.2d at 322 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530

U.S. 133, 143 (2000)).

## III.   DISCUSSION

Mr. Sawka contends that ADP is liable for the sexual harassment its employees

and managers engaged in for the year and four months he was employed there, from

15

November 2009 to March 2011.  He argues that the harassment constituted sex-based discrimination that created a "hostile work environment" and resulted in his constructive discharge, both in violation of Title VII and CFEPA.  He also argues that ADP retaliated against him for complaining about the harassment, also in violation of Title VII and CFEPA, and that ADP intentionally caused him emotional distress.  The Court will address each of Mr. Sawka's claims in turn.

### A.  Sexual Harassment under Title VII and CFEPA

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions or privileges of employment because of [among other grounds] such individual's [ ] sex."  42 U.S.C. §2000e-2(a)(1).  CFEPA analogously prohibits an employer from discriminating against an employee with respect to compensation or "conditions or privileges of employment" because of his sex, among other grounds.  Conn. Gen. Stat. §46a-60(a)(1).  The standards governing CFEPA employment discrimination claims are the same as those governing Title VII.  *See Martinez v. Conn., State Library,* 817 F. Supp.2d 28, 55 (D. Conn. 2011) (collecting cases); *see also e.g., Craine v. Trinity College,* 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.") (citation omitted).  Thus, the Court will analyze the claims under both statutes together.

CFEPA expressly prohibits employers from engaging in sexual harassment.  Conn. Gen. Stat. §46a-60(a)(8).  Sexual harassment is also "[o]ne form of gender discrimination prohibited by Title VII."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986)).  The Equal Employment Opportunity Commission ("EEOC")

Guidelines define "sexual harassment" to include"[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank, FSB,* 477 U.S. at 65 (quoting 29 CFR §1604.11(a)).[16]  CFEPA also defines "sexual harassment" as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature."  Conn. Gen. Stat. §46a-60(a)(8).

Sexual harassment in the workplace is actionable under Title VII and/or CFEPA if it either results in a "hostile work environment" or some kind of tangible employment action, such as firing or failing to promote.  *See Meritor Sav. Bank, FSB,* 477 U.S. at 65 (distinguishing between so-called *quid pro quo* claims and hostile work environment claims but noting both are cognizable theories under Title VII)*; see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752-53 (1998); *see also* Conn. Gen. Stat. §46a-60(a)(8).  Mr. Sawka contends that that both scenarios occurred here, namely that a hostile work environment existed that resulted in his constructive discharge.  Compl. at First, Second, Third, and Fifth Counts, ECF No. 1.

### 1.  Ms. Alvord Comments - Statute of Limitations

Before addressing the substance of Mr. Sawka's sex discrimination claims under Title VII and CFEPA, the Court first must address a statute of limitations issue raised by ADP in order to define the scope of relevant conduct it may consider.  ADP argues that the Court cannot consider comments made by Katy Alvord in April 2010 because they

---

[16] The Supreme Court has noted that the EEOC Guidelines are persuasive but not controlling authority in evaluating Title VII claims.  *See General Elec. Co. v. Gilbert,* 429 U.S. 125, 141-42 (1976) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)), *superseded by statute on other grounds as recognized by Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 88-89 (1983)..

fall outside of the limitations period.[17]  Mot. for Summ. J. 14-15, ECF No. 42-1.  The Court agrees and will not consider them.

A CFEPA claim must be brought to the Connecticut Commission on Human Rights and Opportunities ("CHRO") within 180 days of the last alleged act of discrimination.  Conn. Gen. Stat. §46a-82(f); *see also Rivera v. Men's Warehouse, Inc.,* No. 3:05-CV-1907(WWE), 2006 WL 1801705, at *3 (D. Conn. June 27, 2006).  When a state agency is involved, as in this case, a Title VII claim must be brought to the EEOC within 300 days of the discriminatory act or within 30 days of receiving notice that the state agency has terminated proceedings, whichever is earlier.  42 U.S.C. §2000e-5(e)(1) (under Title VII an EEOC charge must be filed within 180 days after the alleged employment practice, except when proceedings have been instituted in a state agency, like the CHRO, when a charge with the EEOC must have been filed within 300 days of the discriminatory act or 30 days after receiving notice that the State terminated the proceedings, whichever is earlier); *see also Rivera,* 2006 WL 1801705, at *3.  These deadlines function like statutes of limitation.  *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir. 1996) (citation omitted) (Title VII); *Martin v. State*

---

[17] ADP does not raise a statute of limitations defense with respect to any other conduct or comments relevant to this lawsuit in its summary judgment motion.  "If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it *sua sponte.*"  *Davis v. Bryan,* 810 F.2d 42, 44 (2d Cir. 1987) (citations omitted); *see also Day v. McDonough,* 547 U.S. 198, 205 (2006) ("A statute of limitations defense... is not 'jurisdictional,' hence courts are under *no obligation* to raise the time bar *sua sponte.*") (emphasis in the original) (citations omitted).  Accordingly, the Court will not examine the applicability of a statute of limitations defense to any of the other conduct Mr. Sawka relies on to make his case.  *See Jackson v. City of New York,* No. 10 Civ. 7889(RMB), 2013 WL 541510, at *5 n.7 (S.D.N.Y. Feb. 14, 2013) (refusing to analyze a Title VII retaliation claim in terms of the statute of limitations, because the defendants did not specifically assert the defense with respect to that particular claim in its summary judgment motion); *Borski v. Staten Island Rapid Transit,* No04 CV 3614 (SLT) (CLP), 2006 U.S. Dist. LEXIS 89242, at *6 n.2 (E.D.N.Y. Dec. 11, 2006) ("Because Defendants make no specific statute of limitations argument... the Court will assume one sexually harassing act took place [within the limitations period], and therefore consider the entire time period of the hostile environment.").

*Univ. of N.Y.,* 704 F. Supp.2d 202, 222 (E.D.N.Y. 2010) (citations omitted) (Title VII); *Rivera,* 2006 WL 1801705, at *3 (CEFPA).

Mr. Sawka dual-filed a complaint with the CHRO and the EEOC on May 31, 2011 and received a "Release of Jurisdiction" from the CHRO on April 22, 2013, which included an EEOC case number.  Def.'s Ex. M, CHRO Compl.; Compl., Ex. 1, Release of Jurisdiction, ECF No. 1; Mot. to Dismiss Ruling 3, ECF No. 31.  Based on the filing date of this Complaint, the limitations period for CFEPA began on December 2, 2010, and the earliest possible start date under Title VII is August 4, 2010.  Ms. Alvord made her comments in April 2010, before either of these limitations periods.  Accordingly, for the Court to consider Ms. Alvord's comments[18], Mr. Sawka must show that her comments were (1) part of a continuing course of discriminatory conduct and (2) that one act related to this discriminatory course of conduct occurred within the limitations period. *See Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir. 2001) ("[I]f a plaintiff has experienced a 'continuous practice and policy of discrimination... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'") (citations omitted); *Petrosino v. Bell Atlantic,* 385 F.3d 210, 220 (2d Cir. 2004) ("[I]n the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within [the limitations period]; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability.") (citation omitted).

---

[18] The Court can consider acts from before this date as background facts, but they cannot form the basis for liability.  *See Fitzgerald v. Henderson,* 251 F.3d 345, 365 (2d Cir. 2001) (holding that certain aspects of an individual's conduct did not constitute a continuing course of conduct and, thus, could not form the basis for a Title VII sexual harassment claim but noting that the evidence may be relevant to other aspects of the claim, including the harassing individual's state of mind).

19

"[A] continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Fitzgerald,* 251 F.3d at 359 (citation omitted).  Discrete acts of discrimination cannot constitute a continuing course of conduct. *Miner v. Town of Cheshire,* 126 F. Supp.2d 184, 190 (D. Conn 2000) (citations omitted).  To qualify, the events in question need not be related to a formal policy but also cannot be "isolated" or "sporadic" and must constitute a "dogged pattern."  *Valenti v. Carten Controls, Inc.,* No. CIV. 3:94CV1769 AHN, 1997 WL 766854, at *5 (D. Conn. Dec. 4, 1997) (citation and internal quotation marks omitted); *see also Fitzgerald,* 251 F.3d at 362.

Crediting Mr. Sawka's version of the facts, which the Court must at this stage, all of the harassing comments either explicitly or implicitly involved Mr. Sawka's genitalia and physical appearance.  All of them were based on the same stimulus—Mr. Sawka posing nude for Playgirl Magazine—and involved several of the same individuals over time. *See Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir. 1994) (affirming a district court's finding that the discrimination and harassment plaintiff suffered was a "continuing violation" because plaintiff suffered the "same kinds of harassment at the hands of some of the same [individuals].")  However, only Ms. Alvord's comment involved explicit solicitation of sex, making it "qualitatively different" from the other conduct. *See Fitzgerald,* 251 F.3d at 364-65 (rejecting application of the continuing violation doctrine because the allegedly harassing acts became "qualitatively different" over time, changing from sexual advances to harassment for rejecting those sexual advances).  Accordingly, because Ms. Alvord's comment was a clear outlier, the

continuing violation doctrine does not apply, and the Court will not consider her comment in evaluating Mr. Sawka's claims.

### 2.  Hostile Work Environment

To survive summary judgment on a hostile work environment claim under Title VII and CFEPA, Mr. Sawka must show that (1) a hostile work environment existed because of his gender and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir. 1998) (citation omitted); *see also Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007) (citation omitted); *see also Brittell v. Dep't. of Corr.,* 247 Conn. 148, 166-67 (1998) (applying the same standards to a hostile work environment claim under CFEPA).  The Court finds that Mr. Sawka has met his prima facie burden on both elements and raised a genuine issue of material fact as to whether the conduct alleged created a hostile work environment and whether ADP should be liable for it. Accordingly, ADP's motion for summary judgment on the hostile work environment claim must be **DENIED**.

### a.       Because of His Gender

"Title VII aims to eradicate discrimination on the basis of sex, not enact a 'general civility code on the American workplace.'" *Garone v. United Parcel Serv., Inc.,* 436 F. Supp.2d 448, 464 (E.D.N.Y. 2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79 (1998)).  To fall under the ambits of Title VII and CFEPA, therefore, the offending conduct must have occurred because of gender.  *Id.; see also Byra-Grzegorczyk v. Bristol-Meyers Squibb Co.,* 572 F. Supp.2d 233, 245 (D. Conn. 2008) (in the context of both Title VII and CFEPA) (citation omitted).  ADP argues that Mr. Sawka cannot show that the comments were made because of his gender.  It argues

that men made the most offensive comments, and that because there is no evidence that those men sexually desired him, were hostile toward men generally, or treated women differently from him, Mr. Sawka's claim fails.  Mot. for Summ. J. 15-17, ECF No. 42-1. The Court disagrees.

First, Mr. Sawka claims that a number of women made comments and viewed the photographs, thus there is an intersexual aspect to the claim.  Courts and juries have found that "it is reasonable to assume" that proposals of sexual activity made to a member of the opposite sex "would not have been made to someone of the same sex." *Oncale,* 523 U.S. at 80.  The only comments made by women here generically reference the existence of the pictures or searching for Mr. Sawka online.  Because of the intersexual aspect of these interactions, and the fact that Mr. Sawka was naked in the pictures, a reasonable juror could conclude that female interest in the photographs existed because of sexual desire and/or his gender.  *See id.*

With respect to the comments made by men, the Supreme Court has held that same-sex sexual harassment is actionable under Title VII so long as the plaintiff can show that the discrimination occurred because of his or her sex.  *Oncale,* 523 U.S. at 79-81.  The "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex," although that is one permissible way of creating a reasonable inference that discriminatory conduct occurred because of a person's sex, as noted above in the male-female context.  *Id.* at 80.  The use of "sex-specific and derogatory terms" by a member of the same sex, indicating that the "harasser is motivated by general hostility to the presence of [men or] women in the workplace," can create a triable question of fact on a same-sex discrimination claim.  *Id.* In addition, a plaintiff may also offer "directive comparative evidence" showing that one

22

sex is treated differently from the other.  *Id.* at 80-81.  In describing these various, exemplary ways of proving same-sex discrimination claims, the Supreme Court underscored that "whatever evidentiary route the plaintiff chooses to follow," the ultimate inquiry is whether the discrimination occurred because of gender.  *Id.* at 81. ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimina[tion]*... because of... sex." (internal quotation marks omitted) (emphasis in original).

Mr. Sawka indicates that Messrs. Esposito, Kaplan, and Cook made explicit references to his sex appeal and physical appearance in the photographs, including references to the size and state of his genitals.  Because these comments referred to gender-specific aspects of Mr. Sawka's anatomy, a juror could reasonably conclude they were made because of his sex, even without any evidence that they were motivated by sexual desire.  *See Durkin v. Verizon New York, Inc.,* 678 F. Supp.2d 124, 135-36 (S.D.N.Y. 2009) (denying summary judgment on a hostile work environment because, among other considerations, if the jury believed that plaintiff was "treated differently" because of her breast size, the "because of gender" requirement would be satisfied); *Redd v. New York Div. of Parole,* 678 F.3d 166, 179, 181 (2d Cir. 2012) (touching gender-specific body parts was sufficient evidence to show conduct occurred because of sex and noting that "a jury could easily infer that [the] stated desire" to touch someone's penis or breasts, regardless of the gender of the speaker, were motivated by the employee's gender); *see also Harris v. Mayor and City Council,* 429 F. App'x 195, 198, 201 (4th Cir. 2010) (display of "provocative pictures" of women "sexualized [plaintiff's] work place and satisfied the 'because of' gender requirement.'"); *see also Dortz v. City of*

*New York,* 904 F. Supp. 127, 150 (S.D.N.Y. 1995) ("'[I]ntimidation and hostility toward [men] because they are [men] can obviously result from conduct other than explicit sexual advances.'") (citation omitted).

Even if the less specific comments made by men, such as references to the terms timber or lumberjack, did not explicitly invoke gender, a jury could reasonably infer that they are gender-related in the context of the other explicitly gender-specific comments that were made and the fact that the photographs that inspired them depicted a nude man.  *See cf. Brown v. Henderson,* 257 F.3d 246, 256 (2d Cir. 2001) (noting that in some cases, display in the workplace of pictures of naked individuals of a particular gender has "sufficed to support the inference that there was a sex-specific character to the course of conduct.") (collecting cases); *see also Kruger v. Securitas Sec. Servs.,* No. 5:04-CV-91, 2005 WL 2417658, at *2, 4, 8 (W.D. Mich. Sept. 30, 2005) (finding under Michigan law and Title VII that circulation in the workplace of nude photographs that depicted a woman who was purportedly but not actually the plaintiff satisfied the "because of gender" requirement to justify a hostile work environment claim but granting summary judgment in favor of defendant on other grounds); *Carlson v. C.H. Robinson Worldwide, Inc.* No. Civ. 02-3780, 2005 WL 758602, at *21 (D. Minn. Mar. 31, 2005) (finding that where plaintiff's claim was based on frequent and unwanted exposure to pornography, her claim satisfied the "based on sex" requirement because the photographs "almost exclusively involve images of naked women" and the employer had an open workspace "with limited ability for co-workers to avoid seeing each other's screens."); *see also Kanios v. UST, Inc.,* No. 3:03CV369(DJS), 2005 WL 3579161, at *5 (D. Conn. Dec. 30, 2005) (finding that use of "gender-specific slang" and comments about weight gained from pregnancy satisfied the because of sex requirement

sufficiently to substantiate a sex-based hostile work environment claim and "could offer a jury a different perspective on other comments that may be, on their face, gender-neutral.") (citation omitted).  In this case, there is also no evidence that the hostility toward Mr. Sawka existed because of a gender-neutral reason, including "workplace dynamics unrelated to [his] sex" or personal animus.  *See cf. Brown,* 257 F.3d at 256; *see also cf. Dingle v. Bimbo Bakeries USA/Entenmen's,* Nos. 11-cv-02879(CBA)(VVP), 13-CV-03913(CBA)(VVP), 13-CV-04141(CBA)(VVP), 2014 WL 949967, at *2 (E.D.N.Y. Mar. 11, 2014).

   Moreover, a jury could reasonably conclude that the photographs and comments, because they depicted or brought to mind, respectively, nude photographs of a man, were disproportionately offensive and demeaning to men.  *See McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 85 (2d Cir. 2010) (finding that comments such as "'bitch[y],'" "being 'on the rag,'" or a general reference to a "'titty bar'" were gendered terms that could be understood to be "particularly demeaning to women as a group."); *see also Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991) (finding, after a bench trial, that the photographs of nude and partially nude women that were posted in the workplace had a "disproportionately demeaning impact on [ ] women" such that they satisfied the "because of her gender" requirement of a sexual harassment-based hostile work environment claim).  The mere fact that both men and women were exposed to the comments does not preclude a finding of sex-based discrimination.  *See Petrosino,* 385 F.3d at 221-22 (concluding that the "sexually offensive comments and graffiti" at issue were "more offensive to women than to men and, therefore, discriminatory based on sex" even though both men and women were exposed to them equally).  From the foregoing analysis, the Court finds that a

reasonable jury could conclude that all of the comments about the nude photographs, made by men or women, were made because of Mr. Sawka's gender.

### b.      Hostile Work Environment Existed

For Mr. Sawka to meet his burden on the question of whether a hostile work environment existed the Court must, when looking at the totality of the circumstances, find that he has created a genuine issue of material fact as to whether his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). The environment must be "both objectively and subjectively offensive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citation omitted) (under Title VII); *accord Brittell,* 247 Conn. at 167 (under CFEPA) (citation omitted).  In assessing whether a hostile work environment existed, the Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Distasio,* 157 F.3d at 62 (citing *Harris,* 510 U.S. at 21-22).[19]  Interpreting the record before it in the light most favorable to Mr. Sawka, the Court concludes that a reasonable juror could find that a hostile work environment existed.

Mr. Sawka has provided sufficient evidence to create a question of fact as to whether he subjectively found the harassment to be sufficiently severe or pervasive. There are multiple sources in the record indicating that Mr. Sawka did not welcome

---

[19] In evaluating this claim, the Court may consider prior acts as "background," regardless of whether they fall within the limitations period.  *See McGullam,* 609 F.3d at 79 ("explaining that an employee is not barred 'from using… prior acts as background evidence in support of a timely claim.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)).

these comments and was upset by them.  Mr. Sawka also testified that he was

humiliated and upset by his colleagues' comments and that he suffered physical

symptoms, including panic attacks and difficulty sleeping.  Thus, there is sufficient

evidence that would enable a reasonable juror to conclude that Mr. Sawka subjectively

believed the work environment was pervasively offensive.  *See Feingold v. New York,*

366 F.3d 138, 151 (2d Cir. 2004) (finding that testimony by plaintiff that the defendant's

treatment of him "took a psychological toll on him, causing him to become depressed, to

dread going to work, to seek a transfer, and to lose his desire to socialize with people in

general" satisfied the subjective element of a hostile work environment claim).  To find

otherwise would require an assessment of Mr. Sawka's credibility, which is not an

appropriate inquiry to undertake in resolving a summary judgment motion.  *See Kaytor,*

609 F.3d at 545-46 (in deciding a summary judgment motion "the court '*may not make*

*credibility determinations or weigh the evidence...* [those] *are jury functions, not those*

*of a judge.*'") (quoting *Reeves,* 530 U.S. at 150) (emphasis in original).

ADP argues that Mr. Sawka has failed to demonstrate that the conduct that

occurred was objectively offensive or pervasive enough to justify a hostile work

environment claim because it involves nothing more than "office banter."  Mot. for

Summ. J. 21-22, ECF No. 42-1.  The Court disagrees.

A reasonable juror could conclude that these comments were more than

"ordinary socializing in the workplace—such as male-on-male horseplay or intersexual

flirtation."  *Oncale,* 523 U.S. at 81.  While some of the comments made are more

humiliating than others, several of the comments involve Mr. Sawka's anatomy and

genitals and were directly made to him in front of other colleagues.[20]  Mr. Sawka has

also produced evidence showing that his supervisors were aware of some of the

harassing comments and the fact that his colleagues were googling and viewing

photographs of his naked body in the work place.  A reasonable jury could find that the

awareness and inaction of supervisors increased the severity of the conduct.  *See e.g.,*

*Strom v. Holiday Cos.,* 789 F. Supp. 2d 1060, 1083-84 (N.D. Iowa 2011) (noting that

harassing conduct is often perceived as more severe or more difficult to complain about

or address when supervisors participate).

      Contrary to what ADP tries to suggest, the comments involved in this case were

not general sharing of sexual conquests, which would likely not constitute a hostile work

environment.  *See e.g., Dall v. St. Catherine of Siena Medical Ctr.,* 966 F. Supp.2d 167,

190-91 (E.D.N.Y. 2013) (frequent discussion about sex lives and showing explicit

photographs did not amount to a hostile work environment claim); *see also e.g.,*

*Ferrante v. MAS Med. Staffing,* 2015 U.S. Dist. LEXIS 38399, at *10-18, 122 (D. Me.

Mar. 26, 2015) (granting summary judgment because supervisor's discussion of her sex

life with her husband could not establish a hostile work environment claim).  Instead,

they specifically insulted and targeted Mr. Sawka, and a reasonable jury could find that

they were designed to "intimidate, ridicule or demean him."  *Cf. Dall,* 966 F. Supp.2d at

190 (distinguishing comments directly insulting the plaintiff or men from generalized

offensive and sexual comments, which could not establish a hostile work environment

claim).  There is also uncontested evidence that Mr. Sawka's work performance declined

---

[20] However, the fact that some of the comments were not made directly in front of Mr. Sawka does not mean that they could not have contributed to hostile work environment.  *See Dortz,* 904 F. Supp. at 150 (concluding that offensive statements made to plaintiff's staff, outside of his presence, may be viewed as having contributed to creating a hostile work environment and that a factfinder could conclude that such remarks were humiliating because they were made to plaintiff's staff).

while he was employed at ADP, which a reasonable juror could conclude was attributable to the harassment.

Mr. Sawka claims, with record support from multiple sources, that the harassment occurred often over at least a year on a relatively frequent basis. A reasonable juror, if he believed Mr. Sawka's testimony about the frequency of the incidents, could find that the conduct was pervasive. *See Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir. 1997) ("If a jury were to credit [plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident.") (citation omitted); *cf. Brennan v. Metropolitan Opera,* 192 F.3d 310, 319 (2d Cir. 1999) (finding that no reasonable juror could find a hostile work environment where pictures of naked men were displayed in the workplace every day but only one "instances of sexual banter" occurred and there was no evidence of a negative impact on plaintiff's job performance). The mere fact that Mr. Sawka does not remember the details of many of the incidents does not warrant the grant of ADP's summary judgment motion alone, because he has testified that the incidents occurred frequently. *See Torres,* 116 F.3d at 631 (testimony by the plaintiff that harassment occurred "so often that she 'lost count'" was sufficient to defeat motion for summary judgment even where plaintiff could not recall the "exact dates and circumstances" of many incidents).

Taken together over a sustained period of time, a reasonable juror could conclude that the conduct Mr. Sawka describes constituted a hostile work environment. *See Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 61, 63 (2d Cir. 1992) (finding that a hostile work environment was "established" where a manager made comments about plaintiff's breasts and other parts of her body, pretended to masturbate

behind the plaintiff's back to express anger at her and commented that if the plaintiff had male "bodily 'equipment,'" she would have made more sales)[21]; *Petrosky v. New York State Dep't,* 72 F. Supp.2d 39, at 58 (N.D.N.Y. 1999) (finding that photographs of nude women displayed in the bathroom and in a locker combined with "constant" "lewd and vulgar comments, known to but unaddressed by supervisors, concerning both [the plaintiff] and women generally" created a question of fact on a hostile work environment claim) (citations omitted); *Splunge v. Shoney's, Inc.,* 874 F. Supp. 1258, 1273-74 (M.D. Ala. 1994) (finding that comments about the plaintiff's buttocks, comments insinuating that black women were better lovers, a photograph of a naked woman tied to a bed, and public displays of affection between two colleagues were sufficient to overcome a summary judgment motion on a hostile work environment claim); *Robinson,* 760 F. Supp. at 1522, 1524-25 (finding that display of pictures of nude and partially nude women, sexually demeaning comments and jokes, and harassment "lacking a sexually explicit content" justified a finding of a hostile work environment); *Phillips v. Donahoe,* Civil Action No. 12-410, 2013 WL 5963121, at *7-8 (W.D. Pa. Nov. 7, 2013) (finding that the display of photographs of plaintiff's nude body that were taken without her consent in the work place and requests for more "nice pictures" by another colleague created a question of material fact as to whether the workplace was so hostile that it violated Title VII); *Harris,* 429 F. App'x at 202-203 (finding that the presence of sexually explicit pictures throughout the workplace and regular "[d]iscussions between co-workers about

---

[21] ADP contends that this case is distinguishable from the current case because it involved a physical element.  Def.'s Reply 4.  However, that physical element is only described with respect to one plaintiff, not the other, whose claim also merited judgment in her favor.  *Kotcher,* 957 F.2d at 61.  Moreover, physical contact is not needed to establish a hostile work environment claim based on sexual harassment. *See e.g., Howley v. Town of Stratford,* 217 F.3d 141, 154-55 (2d Cir. 2000) (vacating a grant of summary judgment in favor of the male defendant who did not physically touch the plaintiff but made loud comments in a group about how she was a "whining cunt" and did not "suck cock good enough" to get promoted).

'women's anatomy in a sexual manner' and sexual activity with women" sufficient to create a question of material fact as to whether a hostile work environment existed).

Admittedly, the question in this case is a close one, but "the question of whether a work environment is sufficiently hostile to violate Title VII is one of fact." *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 75 (2d Cir. 2001); *see also Oncale,* 523 U.S. at 81-82 (holding that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed [and that] [c]ommon sense and an appropriate sensitivity to social context [are required].").  The Second Circuit has also noted that hostile work environment claims present "'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.'" *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 605 (2d Cir. 2006).  In cases like this one where the question is close, the Court will submit it to a jury.  Accordingly, Mr. Sawka has produced sufficient evidence to create a genuine question of material fact as to whether he experienced a hostile work environment at ADP.

### c.    Liability of Employer

Employers are not always liable under Title VII and CFEPA for hostile work environments created by their employees.  *See Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir. 1994) (citing *Meritor Sav. Bank, FSB,* 477 U.S. at 72).  "[A] plaintiff seeking to recover from an employer for [a] hostile work environment must demonstrate some specific basis to hold the employer liable for the conduct of its employees." *Torres,* 116 F.3d at 633 (citation omitted).  Mr. Sawka has produced evidence that managers, such as Christina Theokary and Bruce Bishop, were engaged in the harassment in some

31

limited sense.[22]  His primary contention, however, is that his colleagues were responsible for the most inappropriate conduct.

When an employee's supervisor engages in the harassing conduct, it is "automatically imputed to the employer," unless the employer proves an affirmative defense by a preponderance of the evidence.  *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 103 (2d Cir. 2010) (citations omitted); *see also Faragher,* 524 U.S. at 807 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.").  To avail itself of the affirmative defense, ADP must prove "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher,* 524 U.S. at 807. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Feingold,* 366 F.3d at 152 (internal quotation marks and citation omitted).

At a minimum, Mr. Sawka has produced evidence showing that supervisors were aware that his photographs were being searched for, viewed, and discussed by many employees in the workplace.  He has shown that managers overheard the "lumberjack" comments made at roll call meetings and that Steven Duke directly overheard and commented on Mr. Esposito's discussion of the size of Mr. Sawka's penis.  This

---

[22] Ms. Theokary was a manager in the Windsor office; Mr. Bishop was a manager in the Milford office. Def.'s Ex. A, Sawka Dep. 37:14-20.

knowledge was sufficient to put ADP on notice that harassing conduct was occurring, which should have prompted an investigation.  *See Distasio,* 157 F.3d at 62 ("An employer who has notice of a hostile work environment has a duty to take reasonable steps to eliminate it.") (citation omitted).  However, none of these supervisors took any corrective action and allowed it to continue for at least one year.  Accordingly, assuming only his colleagues were involved, Mr. Sawka has created a genuine question of material fact as to whether ADP may be held liable for its employees' creation of a hostile work environment.

ADP argues that it had an anti-discrimination policy in place that precludes it from being liable for the conduct of its employees in this case, because it provides a reasonable reporting mechanism for harassment complaints that Mr. Sawka failed to use.[23]  Def.'s Ex. B, ADP's Code of Business Conduct & Ethics.  The policy prohibits harassment and provides that "[a]ssociates that believe they have been subjected to acts of harassment of any kind should immediately inform their manager or supervisor... Any ADP manager who receives such a complaint or has knowledge of harassment or retaliation in the ADP work environment has an obligation to ensure that the matter is investigated."  *Id.* at P000172-73.  The Court agrees that the policy existed and was distributed (indeed, Mr. Sawka testified that he reviewed the policy), but declines to find that it precludes employer liability in this case.  Def.'s Ex. A, Sawka Dep. 178:18-179:6.

While Mr. Sawka was aware of the policy, presumably so were all of the other employees and managers who observed and did not report the harassment.  The fact that managers directly observed the harassment and did not report it could lead a

---

[23] The parties agree that Mr. Sawka eventually complained, but ADP argues that there is no explanation as to why he waited so long to complain if the harassment had been happening since November 2009.  Mot. for Summ. J. 28-29, ECF No. 42-1.

reasonable juror to conclude that it was not a meaningful "corrective opportunity" or that ADP failed to exercise "reasonable care" to prevent sexual harassment.  *See Alonzo v. Chase Manhattan Bank, N.A.,* 70 F. Supp.2d 395, 397-98 (S.D.N.Y. 1999) (finding that while defendant provided sufficient evidence that it had an anti-discrimination policy, the policy could not save the defendant from liability where a "senior official" knew of the harassment and a question of fact existed as to whether his response was reasonable).

Because Mr. Sawka has shown that a genuine issue of material fact exists with respect to his hostile work environment claim, the Court must **DENY** summary judgment on this claim.

### 3.  Constructive Discharge

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Terry,* 336 F.3d at 151-52 (citations omitted).  While the employee need not show that an employer acted with specific intent to withstand summary judgment, he "must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligen[t] or ineffective[ ].'"  *Petrosino,* 385 F.3d at 229-230 (citation omitted) (alterations in original).  He must also show that "viewed as a whole, [the working conditions] are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Terry,* 336 F.3d at 152 (citation omitted).  "Success [on a constructive discharge claim] does not depend upon the plaintiff's subjective beliefs."  *Rivera v. Prudential Ins. Co. of Am.,* No. 95-CV-0829, 95-CV-0830, 1996 WL 637555, at *14 (N.D.N.Y. Oct. 21, 1996).

To survive summary judgment on a constructive discharge claim, Mr. Sawka must produce "evidence of even more severe conditions" than those that create a question of fact on a hostile work environment claim. *See Chenette v. Kenneth Cole Prods., Inc.,* 345 F. App'x 615, 620 (2d Cir. 2009) (citation omitted); *Penn. State Police v. Suders,* 542 U.S. 129, 147 (2004) (noting that a constructive discharge claim involves "something more" than a hostile work environment claim); *see also e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73-74 (2d Cir. 2000) (granting summary judgment on a constructive discharge claim but denying it on a hostile work environment claim); *Lupacchino v. ADP, Inc.,* No. 3:02CV2281 (MRK), 2005 WL 293508, at *5, 6-7 (D. Conn. Jan. 21, 2005) (same). A constructive discharge claim requires more because "'[u]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.'" *Suders,* 542 U.S. at 147 (quoting *Perry v. Harris Chemin, Inc.,* 126 F.3d 1010, 1015 (7th Cir. 1997)).

First, there is insufficient record evidence that ADP deliberately sought to force Mr. Sawka to resign. Indeed, to the extent the evidence indicates that ADP failed to respond to the harassment its managers witnessed and to Mr. Sawka's complaint, ADP may have been negligent or reckless but there is no factual basis for characterizing its actions as intentional. *See Pugni v. Reader's Digest Ass'n, Inc.,* No. 05 Civ. 8026(CM), 2007 WL 1087183, at * 25 (S.D.N.Y. Apr. 9, 2007) (granting summary judgment on a constructive discharge claim because, among other reasons, "even if plaintiff's working conditions were actually intolerable, she has failed to adduce any evidence that [defendant] deliberately made them so in order to force her to resign."). Mr. Sawka admits that he did not inform ADP, after he complained in January 2011, that he

continued to feel harassed.  He resigned roughly two months after he complained. These facts do not indicate that ADP acted intentionally or knew that Mr. Sawka felt harassed and allowed the behavior to continue because it wanted him to quit his job. *See Suders,* 542 U.S. at 149-50 (adopting the reasoning in two Circuit cases that found that even where a supervisor was acting in a problematic way, there could be no constructive discharge claim if the employer proved that he or she was not officially authorized to act in that way); *see also Lupacchino,* 2005 WL 293508, at *7 (employer's failure to take remedial action after receiving a CHRO complaint of sexual harassment, when employer was not provided sufficient time to remedy the situation, did not alone render working conditions sufficiently difficult to make a resignation a constructive discharge).

Second and independent of this problem, Mr. Sawka's claim also fails because he cannot show that the conditions were so difficult or unpleasant that a reasonable person in the employee's situation would have resigned.  Even drawing all inferences in Mr. Sawka's favor and considering Ms. Alvord's comments, courts finding a question of material fact on a constructive discharge claim have required more severe and serious conduct than what occurred in this case.  *See e.g., Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir. 1996) (finding summary judgment was inappropriate on constructively discharge claim where plaintiff's boss repeatedly insulted her in front of others, mocked her, criticized her severely despite her strong performance and "engaged in a pattern of baseless criticisms"); *Chamblee v. Harris & Harris, Inc.,* 154 F. Supp.2d 670, 676 (S.D.N.Y. 2001) (denying summary judgment where plaintiff had sex with her boss and contended that he subsequently "harassed and groped her at every opportunity he had at work; that he explicitly tied her possibility of a promotion to her having sex

36

with him; and that he exposed himself to her.") ; *D'Angelo v. World Wrestling Entm't, Inc.,* No. 3:08-CV-1548 (JCH), 2010 WL 4226479, at * 5-6 (D. Conn. Oct. 18, 2010) (denying summary judgment where plaintiff claims to have endured a "constant stream of sexual comments, as well as physical molestations, by her direct supervisor.").

Moreover, Mr. Sawka endured the harassment for at least one year.  The vast majority of the specific incidents of harassment that he recalls occurred before September 2010, six months before he resigned.  He does not recall any specific incidents that occurred in 2011; Mr. Sawka, therefore, resigned at least three months after the last specific incident of harassment he recalls experiencing.  He does not claim, nor are there facts in the record to support, that ADP "'ratcheted' the harassment up [in 2011] to 'the breaking point' for a reasonable person in [Mr. Sawka's] situation." *Petrosino,* 385 F.3d at 230 (quoting *Suders,* 542 U.S. at 147-48) (finding no constructive discharge despite hostile work environment based on conduct that occurred over eight years); *Woodcock v. Montefiore Med. Ctr. Univ. Hosp.,* No. 98-CV-4420, 2002 WL 403601, at *7-8 (E.D.N.Y. Jan. 28, 2002) (finding no constructive discharge where plaintiff resigned "several months" after most of the incidents upon which the claim was premised); *see Rother v. NYS Dep't of Corr. and Cmty. Supervision,* 970 F. Supp.2d 78, 94 (N.D.N.Y. 2013) (finding no constructive discharge claim where "[t]he most egregious discriminatory incident [ ] took place eight months before [plaintiff's] retirement and approximately three months before she stopped working.").[24]  Without this evidence, Mr. Sawka's narrative of the claim does not add up.  If, as Mr. Sawka asserts, working conditions were not so intolerable that he had to resign from April to

---

[24] Mr. Sawka does testify that the harassment became worse when he moved to the Milford office in April 2010, but he did not resign until roughly one whole year later.  Thus, the sequence of events is still not consistent with the harassment progressing until a reasonable person would have reached his breaking point.

August 2010, when the most egregious incidents of harassment occurred, there is no factual basis for claiming they were more intolerable in March 2011, when he did resign.

For all of the above reasons, Mr. Sawka has failed to show that he was constructively discharged and summary judgment is hereby **GRANTED** on Mr. Sawka's constructive discharge claim under both Title VII and CFEPA.

### B.  Retaliation under Title VII and CFEPA

Title VII prohibits an employer from discriminating "against any of his employees… because [the employee] has opposed any practice made unlawful by this subchapter."  42 U.S.C. §2000e-3(a).  "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice."  *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988).  Similarly, CFEPA prohibits an employer from "expel[ling] or otherwise discriminat[ing] against any person because such person has opposed any discriminatory employment practice," which similarly prohibits retaliatory responses to complaints about conduct falling under CFEPA. Conn. Gen. Stat. §46a-60(a)(4).

Mr. Sawka claims that ADP retaliated against him because of the internal complaint he made on January 17, 2011 to Theresa Madden about the harassment he experienced at ADP.  Opp Br. 28, ECF No. 54-1.  Mr. Sawka makes his claim under Title VII and CFEPA, both of which require the same elements to be met for a retaliation claim.  *See Fasoli v. City of Stamford,* 64 F. Supp.3d 285, 296 (D. Conn. 2014) (citation omitted).

To make out a prima facie case of retaliation Mr. Sawka must show that (1) he engaged in a constitutionally protected activity; (2) the employer was aware of this

activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action. *Reed. v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir. 1996) (citation omitted).  If Mr. Sawka makes out a prima facie case, as mentioned above, under *McDonnell Douglas,* the burden shifts to ADP to provide a legitimate, non-discriminatory basis for its action.  *See Feingold,* 366 F.3d at 157 (citation omitted).  The parties do not dispute that making a complaint to an employer about sexual harassment is a protected activity, regardless of whether the behavior complained of actually violated Title VII.  *See Kotcher,* 957 F.2d at 65 (finding that making an internal complaint about sexual harassment was a "protected activity" for the purposes of a retaliation claim) (citation omitted); *see also Galdieri-Ambrosini,* 136 F.3d at 292 ("[T]he plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possess a 'good faith, reasonable believe that the underlying employment practice was unlawful' under that statute.") (citations omitted).  They also do not dispute that ADP was aware of this complaint.  Instead, ADP argues that Mr. Sawka has failed to meet the last two elements of his prima facie case.  Mot. for Summ J. 32-33, ECF No. 42-1.  The Court agrees.

Mr. Sawka's retaliation claim fails because he cannot show a causal connection between any possible adverse action and his complaint about workplace harassment.  To make a prima facie showing of causation, "[t]he relevant inquiry [ ] must focus on the retaliation [ ]he suffered for complaining about the harassment, not on the initial harassment itself."  S*chiano,* 445 F.3d at 609.  The alleged adverse employment action also must have occurred after or in response to the protected activity.  *See Young v. Westchester Cnty. Dep't Of Soc. Servs.,* 57 F. App'x 492, 495 (2d Cir. 2003) ("[W]here the adverse action was already ongoing at the time of the protected activity, or is very

similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation.") (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)).  Here, much of the conduct that could be viewed as possibly adverse took place before Mr. Sawka complained and thus, could not have been caused by that complaint.  For instance, Mr. Sawka received negative performance evaluations, which could be viewed as an adverse action, but they occurred roughly two months before he made his complaint.

Mr. Sawka also claims that the sexual harassment continued after he complained about it.  In fact, the narrative of his claim is that "nothing changed" after he made his complaint to Ms. Madden and the claimed harassment continued just as it had before. Pl.'s Counterstmt. ¶¶47-48, ECF No. 54-2.  This factual scenario, where the complaint made no difference in the employee's conditions, cannot substantiate a retaliation claim as a matter of law because no causal inference can be drawn between the complaint and the harassment.  *See Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 721 (2d Cir. 2010) (finding that there can be no retaliation claim where a plaintiff's "situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint"); *Usherenko v. Bertucci's Corp.,* Civil Action No. 3:05-cv-756(JCH), 2006 WL 3791389, at * 9 (D. Conn. Dec. 20, 2006) (dismissing a retaliation claim because there was no evidence of a causal connection between the plaintiff's complaint of sexual harassment and her leaving the defendant's employment because plaintiff indicated that after she complained "there was no change").

None of ADP's actions after the complaint was made in January 2011 were sufficiently "adverse" to quality as an "adverse employment action" in retaliation terms.

To make a showing of an "adverse action," "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Kessler v. Westchester Cnty. Dep't. of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (citation omitted).  Because "there are no bright-line rules" regarding what constitutes an adverse action in the context of an employment-based retaliation action, the Court must "pore over" the facts of this case to see whether the challenged conduct "reaches the level of adverse."  *Fincher,* 604 F.3d at 721 (internal quotation marks and citation omitted).

As discussed above, Mr. Sawka's departure from the company was not a constructive discharge and, therefore, cannot be an adverse employment action.[25]  *See e.g., Borski v. Staten Island Rapid Transit,* 413 F. App'x 409, 411 (2d Cir. 2011) (finding that where plaintiff failed to show a constructive discharge, a voluntary decision to leave his employment could not constitute an adverse employment action for the purposes of a retaliation claim).  Mr. Sawka also argues that ADP conducted a subpar investigation of the complaint.  However, these acts cannot constitute an adverse action for the purposes of a retaliation claim, because they are not "'[a]ffirmative efforts to punish a complaining employee,'" nor do they contain a "threat of further harm."  *Fincher,* 604 F.3d at 721 (citation omitted) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint.").  In fact, as mentioned above, Mr.

---

[25] Mr. Sawka argues that he was constructively discharged, which satisfies the adverse employment action requirement.  Opp. Br. 29, ECF No. 54-1.  He does not directly argue that any of ADP's other conduct constituted adverse employment actions, but the Court analyzes the entire circumstance in an abundance of caution.

Sawka contends that his situation was "the same as it would have been had [ ]he not brought the complaint," which undermines his claim of retaliation.  *Id.*

Mr. Sawka contends that Ms. Madden yelled at him and would not share the results of her investigation.  These acts are not severe or drastic enough as a matter of law to constitute an "adverse employment action."  *See Smalls v. Allstate Ins. Co.,* 396 F. Supp.2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at [and] receiving unfair criticism... do not rise to the level of adverse employment actions... because they [do] not have a material impact on the terms and conditions of Plaintiff's employment.") (citation omitted).  It is also difficult to imagine how refusing to share results of the investigation, assuming this is an accurate reflection of the events that occurred, could discourage employees from making those complaints in the first place.  Regardless of Mr. Sawka's knowledge of the quality and/or result of the investigation, he would have been in the same predicament – able to file a complaint knowing that it would be investigated but that he would not know the results of that investigation.  *See Fincher,* 604 F.3d at 721-22 (finding that a defendant's failure to investigate a complaint was not a retaliatory adverse action because this result was unrelated to whether plaintiff filed a complaint or not and defendant's treatment of the plaintiff was consistent in either scenario).

Because Mr. Sawka cannot prove that a causal connection between possible adverse acts and the filing of the complaint or that any actions ADP took after he complained were sufficiently "adverse," he has failed to make out a prima facie case of retaliation.  Accordingly, ADP's Motion for Summary Judgment on Mr. Sawka's Title VII and CFEPA retaliation claims must be **GRANTED.**

### C.  Intentional Infliction of Emotional Distress

Mr. Sawka claims that the sexual harassment he experienced while employed at ADP amounts to intentional infliction of emotional distress.  He seeks to hold ADP vicariously liable for the harassing acts of its employees and managers.

For Mr. Sawka to prevail on this claim, he must show (1) that ADP intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that ADP's conduct was the cause of his distress; and (4) that the emotional distress he sustained was "severe."  *Appleton v. Bd. of Educ. Of Town of Stonington,* 254 Conn. 205, 210 (2000) (citation omitted).  To survive summary judgment on this claim, Mr. Sawka must show a genuine question of material fact exists with respect to all of these four elements.  *See Muniz v. Kravis,* 59 Conn. App. 704, 708-709 (Conn. App. Ct. 2000) (a plaintiff must prove all four elements to prevail on an intentional infliction of emotional distress claim) (citation omitted).

"An employer's inaction in response to complaints of harassment by another employee alone is insufficient to establish extreme and outrageous conduct."  *See Dichello v. Martin Firearms Co.,* No. CV06500296S, 2007 WL 429474, at *4 (Conn. Super. Ct. Jan. 22, 2007).  Accordingly, the Court must determine whether any employees engaged in extreme and outrageous actions that can be fairly attributable to the employer.  *See e.g., Girard v. Lincoln Coll. Of New Eng.,* 27 F. Supp.3d 289, 302 (D. Conn. 2014) (granting summary judgment on intentional infliction of emotional distress claims against employer because, among other reasons, acts of employee could not be attributed to employer).

To hold an employer liable for the acts of its employees, a plaintiff must show that the employee was acting within the scope of his employment and in furtherance of the employer's business. *See A-G Foods, Inc. v. Pepperidge Farm, Inc.,* 216 Conn. 200, 208 (1990) (noting this principle in the context of intentional torts) (collecting cases); *Marini v. Costco Wholesale Corp.,* 64 F. Supp.3d 317, 331 (D. Conn. 2014) ("[A] company is not liable for the intentional torts of its employees that are engaged in outside the scope of their employment.") (citations omitted). In evaluating whether an employee was acting within the scope of his employment, courts look to whether the employee's conduct: "(1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp v. King,* 266 Conn. 747, 782-83 (2003).

"Ordinarily, the question of whether the employee's tort occurred within the scope of his employment and in furtherance of his master's business is a... [question of fact], but 'there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law.'" *Murphy v. Robert Burgess & Norwalk Economic Opportunity Now, Inc.,* No. 3:96CV01987(AHN), 1997 WL 529610, at *7 (D. Conn. July 16, 1997) (quoting *A-G Foods, Inc.,* 216 Conn. at 207). Sexual harassment is "usually motivated by something personal, [so] ordinarily [it] does not fall within the scope of employment." *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 161-62 (2d Cir. 2014) (citing *Ellerth,* 524 U.S. at 756-57); *see also Higgins v. Metro-North R.R. Co.,* 318 F.3d 422, 426 (2d Cir. 2003) ("It is well settled that sexual harassment 'consisting of unwelcome remarks and touching is motivated solely by

individual desires and serves no purpose of the employer.'") (quoting *Faragher,* 524 U.S. at 794).

There are no facts in the record from which any reasonable juror could conclude that the inappropriate comments that Mr. Sawka's colleagues and managers made were made within the scope of their employment and in furtherance of ADP's business. Although all of them occurred either in the workplace or at a function organized by ADP, humiliation of the type Mr. Sawka claims was not in any ADP employee's job description, did not benefit ADP, and was prohibited by its Code of Business Conduct & Ethics.  Def.'s Ex. B, ADP's Code of Business Conduct & Ethics at P000172-73; *see also Marini,* 64 F. Supp.3d at 332 (granting summary judgment on an intentional infliction of emotional distress claim because "humiliation and abuse of the type plaintiff alleges was not part of [employee's] job description and indeed was prohibited by the terms of the Employment Agreement.").  Accordingly, summary judgment must be **GRANTED** on Mr. Sawka's intentional infliction of emotional distress claim.

## IV.    CONCLUSION

For all of the foregoing reasons, ADP's Motion for Summary Judgment, ECF No. 42, is **GRANTED** with respect to Mr. Sawka's constructive discharge and retaliation claims under Title VII and CFEPA.  It is also **GRANTED** with respect to his intentional infliction of emotional distress claim.  It is **DENIED** on his hostile work environment claims under Title VII and CFEPA.

**SO ORDERED** this 29th day of September 2015 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge